**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**1:15cr101**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| **BRIAN BOWMAN,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

Pending before the Court is the Motion to Suppress [# 13]. Defendant

Bowman moves to suppress evidence discovered during a traffic stop. The Court

**RECOMMENDS** that the District Court **DENY** the Motion to Suppress [# 13].

## I.     Factual Background

Officer Aaron Lisenbee is an officer with the Henderson County Sheriff's

Office. (Hr'g Tr. 4:19-22.)   Officer Lisenbee is currently assigned as a Task Force

Officer with the Drug Enforcement Administration. (Hr'g Tr. 5:1-4.)  On June 19,

2015, Officer Lisenbee received a call from a deputy with the Buncombe County

Sheriff's Office indicating that the deputy had received information from a

confidential informant that Defendant Bowman was going to pick up a Hispanic

male in Henderson County that day and travel to Atlanta, Georgia to pick up

1

crystal methamphetamine and transport the methamphetamine back to Henderson County and Asheville. (Hr'g Tr. 7:17-8:2; 15:4-10;17:13-24.) This deputy also informed Officer Lisenbee that Defendant Bowman would be driving a red Lexus. (Hr'g Tr. 8:8-9.)

Based on the information provided by the informant, Officer Lisenbee decided to conducted surveillance of Defendant Bowman. (Hr'g Tr. 16:1-3.) As a result of this surveillance, officers identified the Hispanic male as Homero Alvarez, whom Officer Lisenbee recognized and believed to be involved in the trafficking of methamphetamine. (Hr'g Tr. 6:4-20; 8:13-23; 16:22-17:1.) During this surveillance, officers witnessed the red Lexus arrive at the home of Homero Alvarez, who got into the vehicle. (Hr'g Tr. 9:7-11.) The occupants then traveled to a single wide trailer, where Alvarez remained while Defendant Bowman returned to his residence. (Hr'g Tr. 9:11-20; 16:10-17.) Subsequently, Defendant Bowman drove to Asheville for an interview with a Buncombe County detective, but this interview was unrelated to the drug trafficking investigation. (Id.) After the meeting with the detective, Defendant Bowman picked Alvarez back up, and the two proceeded to take the U.S. Highway 25 connector towards Greenville, South Carolina. (Hr'g Tr. 9:21-10:4; 16:17-21.) Once Defendant Bowman and Alvarez reached the North Carolina/South Carolina state line, the officers

discontinued surveillance.  (Hr'g Tr. 10:4-10; 16:17-21.)  No surveillance of

Defendant Bowman or the vehicle was conducted once the vehicle left North

Carolina.  (Hr'g Tr. 18:3-11.)

After the vehicle crossed the state line, Officer Lisenbee made arrangements

to conduct surveillance of U.S. Highway 25 to observe the red Lexus when it

reentered North Carolina.  (Hr'g Tr. 10:19-23.)  The same informant that had

previously provided the information about Defendant Bowman also informed the

officers that Defendant Bowman would be traveling back to North Carolina early

the morning of June 20, 2015.  (Hr'g Tr. 11:2-9.)  Because there was no

surveillance of the vehicle or Defendant Bowman once they crossed into South

Carolina, however, the officers did not witness a drug transaction in Atlanta and

did not actually know where the vehicle had traveled.  (Hr'g Tr. 18:12-19:6; 20:3-

5; 25:18-21.)    As a result of the information provided by the informant, Officer

Lisenbee notified the North Carolina State Highway Patrol to develop their own

reasonable suspicion to conduct a traffic stop of the vehicle.   (Hr'g Tr. 11:17-

12:16; 21:17-19; 77:1-3; 78:2-8.)

When Officer Lisenbee relayed the information that the vehicle was

traveling back into North Carolina, he informed the Highway Patrol that Defendant

Bowman was driving the vehicle, Alvarez was the passenger, the make and color

of the vehicle, the tag number, and that he had information that they were traveling from Atlanta with methamphetamine. (Hr'g Tr. 20:20-21:13.) One of the law enforcement officers on duty on June 20, 2015, was Andrew Waycaster, a Trooper with the North Carolina State Highway Patrol. (Hr'g Tr. 12:23-13:4; 27:14-22.) Trooper Waycaster was in uniform and driving a marked patrol car. (Hr'g Tr. 30:4-11.) Trooper Waycaster received information over the radio that Defendant Bowman and Alvarez were possibly returning from Atlanta with methamphetamine and would be driving a red, older model Lexus. (Hr'g Tr. 31:19-25;13:5-16; 20:15-21:04; 74:12-76:22.) In addition, Trooper Waycaster knew the license plate number of the vehicle. (Hr'g Tr. 31:24-25; 75:10-11.)

Based on the information provided over the radio, Trooper Waycaster positioned his patrol car on the side of Northbound U.S. 25 in order to locate the vehicle as it crossed back into North Carolina. (Hr'g Tr. 32:16-20; 144:1-2.) At 3:40 a.m. on June 20, 2015, Trooper Waycaster witnessed the red Lexus in question traveling on U.S. 25. (Hr'g Tr. 32:21-24.) He also observed the vehicle travel over the right fog line. (Hr'g Tr. 33:2-6; 84:13-16.) After Trooper Waycaster pulled behind the vehicle, he observed the vehicle continue to weave and accelerate over the speed limit. (Hr'g Tr. 33:2-34:13; 85:3-8; 86:2-5; Gov.'s Ex. 1.) Trooper Waycaster, however, did not have a radar on the vehicle at any

4

time. (Hr'g Tr. 85:2-12.) Based on his observations, Trooper Waycaster believed that the driver of the vehicle might be driving under the influence. (Hr'g Tr. 33:12-14.) Accordingly, Trooper Waycaster activated his blue light to initiate a traffic stop of the vehicle. (Hr'g Tr. 34:9-10.) The decision to stop the vehicle was based on the traffic infractions Trooper Waycaster observed, not the information from the informant regarding the potential presence of methamphetamine in the vehicle. (Hr'g Tr. 35:13-18.)

After the driver of the vehicle pulled to the side of the road, Trooper Waycaster approached the passenger side of the vehicle. (Hr'g Tr. 38:15-23.) Defendant Bowman was in the driver's seat and Alvarez was in the front passenger seat. (Hr'g Tr. 39:3-10.) As he approached the vehicle, Trooper Waycaster asked Defendant Bowman and Alvarez to let him see their hands. (Hr'g Tr. 38:23-2; Gov.'s Ex. 1.) Alvarez was continually staring straight ahead and moving around in the vehicle and not looking back at Trooper Waycaster. (Hr'g Tr. 39:19-40:1.) Trooper Waycaster noticed loose clothes and a large suitcase in the backseat of the vehicle; food wrappers, food, and an energy drink were in the center console area of the vehicle. (Hr'g Tr. 40:2-6; 88:1-24.) These items in the car indicated to Trooper Waycaster that the individuals in the car might have been traveling for a long period of time and in a hurry to get from one location to another such that

they would not take the time to stop and rest or have meals. (Hr'g Tr. 40:2-13.)

Trooper Waycaster, however, did not observe any drugs, guns, or alcohol in the car

and did not notice any smell of alcohol or marijuana. (Hr'g Tr. 87:16-25.)

According to the testimony of Trooper Waycaster, both Defendant Bowman

and Alvarez appeared nervous when he approached the car. (Hr'g Tr. 41:1-21.)

Defendant Bowman's hand was shaking when he handed his driver's license to

Trooper Waycaster, and Trooper Waycaster could see the carotid artery area on

their necks moving. (Id.) Trooper Waycaster believed that Alvarez appeared

more nervous than the general population during a traffic stop. (Hr'g Tr. 9-18.)

Trooper Waycaster asked Defendant Bowman if he had any weapons on

him, to which Defendant Bowman responded that he did not. (Hr'g Tr. 42:10-16.)

Trooper Waycaster then asked Defendant Bowman to exit his vehicle and meet

Trooper Waycaster at the rear of the vehicle in front of the patrol car. (Id.) After

Defendant Bowman complied and exited his vehicle, Trooper Waycaster asked

Defendant Bowman if he could pat him down for weapons; Defendant Bowman

consented to the search of his person for weapons. (Hr'g Tr. 44:7-14; Gov.'s Ex.

1.) The pat down lasted approximately ten seconds and did not reveal any

weapons or contraband. (Hr'g Tr. 44:7-17; Gov.'s Ex. 1.) While he was patting

down Defendant Bowman, Trooper Waycaster noticed Alvarez continually moving

around in the front passenger seat and turning around to look at what was happening behind the vehicle. (Hr'g Tr. 45:15-20.)

After confirming that Defendant Bowman was not carrying a weapon, Trooper Waycaster asked Defendant Bowman to have a seat in the right passenger seat of the patrol car. (Hr'g Tr. 46:2-11; Gov.'s Ex. 1.) Having the driver get inside his patrol car while he checks the driver's registration and license is Trooper Waycaster's common practice when conducting a roadside stop. (Hr'g Tr. 43:8-25; 97:8-18.) Once in the patrol car, Trooper Waycaster began checking the vehicle registration and Defendant Bowman's license, as well as conversing with Defendant Bowman. (Hr'g Tr. 46:14-28.) Trooper Waycaster inquired where Defendant Bowman was headed and where he was coming from, to which Defendant Bowman responded that he was heading home after picking up Alvarez at Alvarez's girlfriend's house. (Hr'g Tr. 46:19-47:4.) In response to a follow up question from Trooper Waycaster, Defendant Bowman stated that he did not remember what the road was called where Alvarez's girlfriend lived, but that he had the address on the screen of his GPS in the car. (Gov.'s Ex. 1; Hr'g Tr. 48:3-10.) Defendant Bowman also stated that he purchased the car last week, and that it was a little shaky in the front end. (Gov.'s Ex. 1.) Defendant Bowman stated that he lived in Black Mountain, North Carolina but that he had been staying in

Fletcher with his girlfriend, and that Alvarez lived about twenty minutes from Defendant Bowman. (Gov.'s Ex. 1.)

Trooper Waycaster again inquired into where Defendant Bowman had picked up Alvarez, and Defendant Bowman responded that it was a "good ways back there" and that it was up on the GPS. (Gov. Ex. 1.) Defendant Bowman stated that Alvarez's car was not legal and that Alvarez had picked him up in the past before Defendant Bowman had a car. (Hr'g Tr. 49:17-21; Gov. Ex. 1.) Defendant Bowman stated that he was a welder/fabricator, but was currently laid off. (Hr'g Tr. 50:1-2; Gov.'s Ex. 1.) In response to a question about prior tickets, Defendant Bowman stated that he buys cheap cars off of craigslist. (Gov.'s Ex. 1; Hr'g Tr. 50:3-10.) Trooper Waycaster viewed the fact that Defendant Bowman bought cars off of craigslist as suspicious because it is a known practice with drug traffickers to use rental vehicles or multiple, different vehicles to transport narcotics. (Hr'g Tr. 50:11-21.) Although Defendant Bowman answered all of Trooper Waycaster's questions, Trooper Waycaster testified that Defendant Bowman appeared nervous while in the patrol car and could not sit still. (Hr'g Tr. 105:13-20.)

At this point, Trooper Waycaster handed Defendant Bowman a warning, returned his license and registration, and asked Defendant Bowman if he had any

questions. (Gov.'s Ex. 1; Hr'g Tr. 50:22-24.) After speaking with Defendant Bowman, Trooper Waycaster no longer suspected that Defendant Bowman was under the influence. (Hr'g Tr. 51:22-52:2.) Defendant Bowman responded that he had no questions, the two shook hands, Defendant Bowman told Trooper Waycaster to have a good night, and Defendant Bowman began exiting the patrol car. (Gov.'s Ex. 1; Hr'g Tr. 51:1-3.) At this point, Trooper Waycaster asked Defendant Bowman if he could ask him some more questions, and Defendant Bowman immediately responded "sure." (Gov.'s Ex. 1; Hr'g Tr. 51:1-12; 107:6-19.) Defendant Bowman was not handcuffed at the time and Trooper Waycaster did not have his gun out. (Hr'g Tr. 51:13-16.)

After Defendant Bowman agreed to answer some additional questions, Trooper Waycaster asked Defendant Bowman for a third time about where he had picked up Alvarez. (Gov.'s Ex. 1; Hr'g Tr. 52:3-21.) Defendant Bowman again stated that he did not know the address but that it was on his GPS and that he believed it was in North Carolina but he was not sure where the state line was located. (Gov.'s Ex. 1.) Defendant Bowman also stated that he had been driving 25 to 30 minutes since he picked up Alvarez. (Gov.'s Ex. 1; Hr'g Tr. 52:6-11.) Finally, Defendant Bowman stated that he did not know the name of Alvarez's girlfriend. (Gov.'s Ex. 1; Hr'g Tr. 52:18-21.)

After asking Defendant Bowman these additional questions, Trooper Waycaster informed Defendant Bowman that he was going to question Alvarez. (Gov.'s Ex. 1.)  Trooper Waycaster stated: "I am going to ask him a question if you don't mind, ok." (Id.)  Defendant Bowman responded, "ok." (Id.)  Trooper Waycaster then began exiting the patrol car and told Defendant Bowman to: "hang tight right there, ok." (Id.)  Defendant Bowman again responded, "ok." (Id.)   At this point Trooper Waycaster testified that Defendant Bowman was not free to leave and could not have gotten out of the patrol car and left the scene in his vehicle.  (Hr'g Tr. 112:7-11; 113:15-25; 118:8-10.)   When Trooper Waycaster tells someone to hang tight, he intends for the individual to sit still.  (Hr'g Tr. 116:3-6.)

Trooper Waycaster then approached Alvarez, who was still in the passenger seat of the vehicle.  (Hr'g Tr. 1-3.)  As he approached Alvarez, Trooper Waycaster directed Alvarez to put his hands where he could see them.  (Gov. Ex. 1.)  Once he arrived at the passenger side window, Trooper Waycaster told Alvarez he could put his hands down.  (Gov. Ex. 1.)  Alvarez was still looking straight ahead with a "wide-eyed, blank stare." (Hr'g Tr. 53:16-19.)  Alvarez would not look Trooper Waycaster in the eyes while he was speaking to him.  (Hr'g Tr. 127:3-8.)  Trooper Waycaster could still see the increased heartbeat in Alvarez's carotid artery. (Hr'g

Tr. 53:19-21.) Trooper Waycaster then immediately started questioning Alvarez about where he and Defendant Bowman had been. (Gov.'s Ex. 1.) Alvarez stated that he and Defendant Bowman had been visiting some friends in Georgia. (Gov.'s Ex. 1; Hr'g Tr. 6-13.) Based on the conflicting stories from Defendant Bowman and Alvarez about where they had been, Trooper Waycaster became more suspicious that the two were engaged in criminal activity. (Hr'g Tr. 53:22-54:21.)

After speaking with Alvarez, Trooper Waycaster returned to the patrol car to continue questioning Defendant Bowman. (Gov.'s Ex. 1.) Trooper Waycaster again asked Defendant Bowman where he and Alvarez had been, and Defendant Bowman again confirmed that he had picked up Alvarez from Alvarez's girlfriend's house. (Id.) Trooper Waycaster then asked Defendant Bowman if he had any guns or illegal narcotics in the car; Defendant Bowman responded no. (Id.; Hr'g Tr. 54:22-55:11.)

At this point, Trooper Waycaster asked Defendant Bowman if he could search his vehicle. (Gov.'s Ex. 1; Hr'g Tr. 55:14-18.) Defendant Bowman did not give Trooper Waycaster permission to search the vehicle. (Gov.'s Ex. 1; Hr'g Tr. 55:14-18.) Trooper Waycaster then told Defendant Bowman to "hang tight" and existed the patrol car. (Gov.'s Ex. 1; Hr'g Tr. 55:19-23.) Trooper Waycaster then spoke with Trooper Blanton and Sergeant Stines, who had previously arrived

on the scene, and advised them of his suspicion that Defendant Bowman and Alvarez were engaged in criminal activity.  (Hr'g Tr. 55:19-56:3; Gov.'s Ex. 1.)

After speaking with the other officers, Trooper Waycaster returned to the vehicle and told Alvarez to step out of the vehicle.  (Gov.'s Ex. 1; Hr'g Tr. 56:7-10.)  Once Alvarez stepped out of the vehicle, Trooper Waycaster patted Alvarez down for weapons and placed Alvarez in the back right seat of the patrol vehicle.  (Gov.'s Ex. 1; Hr'g Tr. 56:9-16.)  Trooper Blanton then ran a K-9 around the perimeter of the vehicle.  (Gov.'s Ex. 1.)  Trooper Blanton indicated that he received a positive alert from the K-9, so Trooper Blanton opened the passenger door to allow the K-9 inside the vehicle.  (Gov.'s Ex. 1; Hr'g Tr. 56:22-57:11.) The K-9 then gave a positive alert inside the vehicle.  (Hr'g Tr. 57:17-22.)

After the two positive alerts by the K-9, Trooper Waycaster began searching the vehicle.  (Hr'g Tr. 58:17-24.)  This decision to prolong the traffic stop and search the vehicle was entirely based upon what Trooper Waycaster learned once he pulled over the vehicle, not on the information he was provided over the radio.  (Hr'g Tr. 82:6-17; 83:17-21; 134:3-7; 137:8-17; 149:11-150:4.)  Trooper Waycaster located a tablet style computer with a crystalline substance across the top of it and down in the floor area.  (Id.)  The appearance of the substance was consistent with the appearance of crystal methamphetamine.  (Hr'g Tr. 59:4-8.)

Trooper Waycaster then located a plastic bag of ammunition and a box of ammunition. (Hr'g Tr. 59:9-13.) Meanwhile, Defendant Bowman and Alvarez were still in the patrol car discussing where Alvarez hid the methamphetamine in the vehicle. (Gov.'s Ex. 1.) At this point, Trooper Waycaster secured both Defendant Bowman and Alvarez by placing them in handcuffs and placing them back in his patrol car. (Hr'g Tr. 59:18-22.) Trooper Waycaster then returned to the vehicle to continue the search of the vehicle. (Hr'g Tr. 59:23-60:4.) Trooper Waycaster found a small bag of methamphetamine in the floorboard and Trooper Blanton located a large bag of methamphetamine in the center console. (Hr'g Tr. 60:1-24.) The officers eventually recovered approximately 70 grams of methamphetamine from the vehicle. (Hr'g Tr. 61:4-6.) The officers also recovered a digital scale from the trunk. (Hr'g Tr. 61:14-16.)

Once the officers recovered all the evidence from the vehicle, the officers placed Defendant Bowman and Alvarez under arrest and transported them to the Hendersonville County Detention Center. (Hr'g Tr. 62:12-17.) Once in custody at the detention center, Officer Lisenbee advised Defendant Bowman of his Miranda rights. (Hr'g Tr. 24:1-12.) Defendant Bowman then admitted to Officer Lisenbee that he had traveled to Atlanta to pick up methamphetamine and bring it back to North Carolina. (Hr'g Tr. 24:13-25:5.)

Subsequently, the Grand Jury indicted Defendant Bowman on one count of possession of methamphetamine with intent to distribute. (Indictment 1, ECF No. 1.) Defendant Bowman then moved to suppress the evidence seized during the search of the vehicle, as well as any statements made by Defendant Bowman. The District Court referred the motion to this Court. Having conducted an evidentiary hearing, and after providing the parties the opportunity to submit post-hearing briefs, the Motion to Suppress is now before this Court for a Memorandum and Recommendation to the District Court.

## II.    Analysis

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend 4. A traffic stop constitutes a seizure of the driver under the Fourth Amendment. United States v. Guijon-Ortiz, 660 F.3d 757, 764 (4th Cir. 2011). In order to comply with the requirements of the Fourth Amendment, the stop must be reasonable under the circumstances. United States v. Palmer, __ F.3d __, 2016 WL 1594793, at *5 (4th Cir. 2016); United States v. Williams, 808 F.3d 238, 245 (4th Cir. 2015). Courts analyze the constitutionality of a traffic stop

under the two prong standard the United States Supreme Court set forth in Terry v. Ohio, 292 U.S. 1, 88 S. Ct. 1868 (1968). Williams, 808 F.3d at 245.

The Court must first determine whether the officer's articulated basis for the stop was legitimate. Id. In addressing this first prong, the Court does not discern the subjective intent of the officer for stopping the vehicle. Palmer, 2016 WL 1594793, at *5. Rather, the Court looks to whether the circumstances, when viewed objectively, justified the action of the officer in stopping the vehicle. Id.

Second, the Court examines whether the actions of the officer during the traffic stop were reasonably related in scope to the basis of the seizure. Williams, 808 F.3d at 245.

> Terry's second prong restricts the range of permissible actions that a police officer may take after initiating a traffic stop. An officer is entitled to conduct safety-related checks that do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle registration, or checking for criminal records and outstanding arrest warrants. See Rodriguez v. United States, ___U.S. ___, ___ _ ___, 135 S. Ct. 1609, 1615–16, 191 L.Ed.2d 492 (2015). Generally, however, an officer's focus must remain on the bases for the traffic stop, in that the stop must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." See United States v. Guijon–Ortiz, 660 F.3d 757, 764 (4th Cir.2011) (internal quotation marks omitted).

Palmer, 2016 WL 1594793, at *5. For example, an officer may require the driver of a lawfully stopped vehicle to exit the vehicle in order to protect the safety of the

officer.  See United States v. Sakyi, 160 F.3d 164, 167 (4th Cir. 1998); United States v. Stanfield, 109 F.3d 976, 977 (4th Cir. 1997).

A legitimate traffic stop, however, may become unlawful if the officer extends the stop beyond the time reasonably required to complete its initial objective, and the officer may not investigate a matter outside the scope of the initial stop unless the officer receives the consent of the driver or "develops reasonable, articulable suspicion of ongoing criminal activity." Id. at *6.  This includes extending a completed traffic stop to conduct a dog sniff of the vehicle. Williams, 808 F.3d at 245.

As the United States Court of Appeals for the Fourth Circuit has recently explained:

> Reasonable suspicion is a "commonsense, nontechnical" standard that relies on the judgment of experienced law enforcement officers, "not legal technicians." *See Ornelas v. United States*, 517 U.S. 690, 695, 116 S. Ct. 1657, 134 L.Ed.2d 911 (1996) (internal quotation marks omitted). To support a finding of reasonable suspicion, we require the detaining officer "to either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance." *See United States v. Foster*, 634 F.3d 243, 248 (4th Cir.2011).

> Under the applicable principles, the relevant facts articulated by the officers and found by the trial court, after an appropriate hearing, must "in their totality serve to eliminate a substantial portion of innocent travelers." *See United States v. McCoy*, 513 F.3d 405, 413 (4th

Cir.2008). As our McCoy decision explained, however, each articulated fact need not "on its own eliminate every innocent traveler." *Id.* Rather, we "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *See United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L.Ed.2d 740 (2002) (internal quotation marks omitted).

<u>Williams</u>, 808 F.3d at 246; <u>see</u> <u>also</u> <u>Palmer</u>, 2016 WL 1594793, at *6. Prior to conducting an actual search of the vehicle, and absent consent or a warrant, the officer must develop probable cause to believe that the vehicle contains evidence of criminal activity. <u>Palmer</u>, 2016 WL 1594793, at *6. An alert on a vehicle by a trained drug dog can provide probable cause to search the vehicle. <u>See</u> <u>id.</u>

As a threshold matter, Trooper Waycaster articulated an objectively reasonable basis for stopping Defendant Bowman – speeding and weaving over the fog line. The Court found Trooper Waycaster's testimony regarding his basis for stopping Defendant Bowman creditable and supported by the video from the video recording device in the patrol car. Because Trooper Waycaster had an objectively reasonable basis for stopping the red Lexus, the Court finds that the traffic stop satisfies the initial <u>Terry</u> prong.

The Court also finds that the frisk of Defendant Bowman did not violate the Fourth Amendment. After asking Defendant Bowman to exit the vehicle, Trooper Waycaster asked Defendant Bowman whether he could frisk him for weapons.

Defendant Bowman verbally consented to the search of his person. A search

conducted pursuant to a valid consent is permissible under the Fourth Amendment.

Schneckloth v. Bustamonte, 412 U.S. 218, 222, 93 S. Ct. 2041, 2045 (1973). The

Court also finds that the verbal consent was freely and voluntarily given. See id.

The Court notes, however, that even had the frisk been unlawful it would have no

impact on this case because the frisk did not result in the seizure of any evidence

and did not lead to the seizure of any evidence.

Similarly, Trooper Waycaster did not run afoul of the Fourth Amendment

while questioning Defendant Bowman as he ran his checks and issued the warning.

As the Fourth Circuit has made clear, an officer may ask questions unrelated to the

purpose of the stop provided that the questions do not extend the encounter.

United States v. Digiovanni, 650 F.3d 498, 507 (4th Cir. 2011). "Both *Mena* and

*Johnson* make clear that unrelated questioning during an investigative stop,

including a traffic stop, does not run afoul of the scope component of *Terry 's*

second prong." Id. at 507-08. Here, the questions posed to Defendant Bowman

while Trooper Waycaster was running the checks and issuing the warning did not

extend the stop and did not run afoul of the Fourth Amendment or the requirements

set forth by the Supreme Court in Terry.

The point in the traffic stop that gives the Court some concern, however, is

the extension of the stop to question Alvarez. After questioning Defendant Bowman in the patrol car, Trooper Waycaster gave Defendant Bowman a warning and returned his information, thereby concluding the traffic stop. Having concluded the initial stop, Trooper Waycaster needed either the consent of Defendant Bowman or reasonable, articulable suspicion of ongoing criminal activity to prolong the stop. See Palmer, 2016 WL 1594793, at *6.

After concluding the traffic stop and asking Defendant Bowman a couple of follow up questions about where he picked up Alvarez, Trooper Waycaster informs Defendant Bowman that he is going to question Alvarez and directs Defendant Bowman to remain in the patrol car. Unlike when Trooper Waycaster plainly and unequivocally asks Defendant Bowman for permission to pat him down for weapons and to ask him a few follow up questions, Defendant Bowman is not given an opportunity to decline Trooper Waycaster's request to extend the stop so that he can question Alvarez. Trooper Waycaster directs Defendant Bowman to stay in the patrol car while he questioned Alvarez. At no point does Trooper Waycaster tell Defendant Bowman that he is free to leave or even imply that Defendant Bowman could decline to remain in the patrol car while Trooper Waycaster questions Alvarez. In fact, Trooper Waycaster even testified that Defendant Bowman was not free to leave at that time and that he could not have

gotten out of the patrol car, terminate the encounter, and leave the scene. Under the totality of the circumstances, a reasonable person in Defendant Bowman's position would not have felt free to leave and terminate the traffic stop after being directed by Trooper Waycaster to remain in the patrol car while the officer questioned the passenger; the stop did not transition into a voluntary encounter. See United States v. Weaver, 282 F.3d 302, 309-10 (4th Cir. 2002) ("Generally speaking, a "seizure" warranting protection of the Fourth Amendment occurs when, in view of the totality of the circumstances surrounding the "stop," a reasonable person would not feel free to leave or otherwise terminate the encounter."). Accordingly, the Government may not rely on the consent of Defendant Bowman to justify the extension of the traffic stop to question Alvarez.

Based on the Court's finding that Trooper Waycaster did not have the consent of Defendant Bowman to extend the stop to question Alvarez, the Court must determine whether Trooper Waycaster had a reasonable, articulable suspicion of ongoing criminal activity to prolong the stop. Trooper Waycaster testified that Defendant Bowman and Alvarez both appeared nervous, and that Defendant Bowman's hand was shaking when he handed him his driver's license. Trooper Waycaster also observed the carotid artery area of Defendant Bowman and Alvarez moving on their necks, which suggested an elevated heart rate and nervousness.

Alvarez continuously stared straight ahead when he was initially approached by Trooper Waycaster. While Trooper Waycaster spoke to Defendant Bowman in his patrol car, Defendant Bowman appeared nervous and could not sit still.

When he first approached the vehicle, Trooper Waycaster also observed a large suitcase in the backseat of the vehicle with loose clothes. In the console area of the vehicle, Trooper Waycaster observed an energy drink, food, and food wrappers. While observing these items in a car could be consistent with innocent travel, they suggested to Trooper Waycaster that Defendant Bowman and Alvarez might have been traveling for a long period of time and in a hurry to get from one location to another. And in light of Defendant Bowman's statement that he was just picking Alvarez up from this girlfriend's house, these items, under the totality of the circumstances, were sufficient to cause Trooper Waycaster to doubt that Defendant Bowman was telling him the truth as to where he had been traveling. The fact that Defendant Bowman could not state where Alvarez's girlfriend lived added to Trooper Waycaster's suspicion. Finally, Defendant Bowman stated that he had just purchased the vehicle despite being recently laid off, and that he bought cheap cars off of craigslist. Trooper Waycaster found these statements suspicious because a known practice of drug traffickers is to use multiple, different vehicles to transport narcotics.

Again, while may of the statements of Defendant Bowman and the observations of Trooper Waycaster might on their own appear consistent with innocent travel – the presence of an energy drink for example – the totality of the circumstances in this case was sufficient to provide Trooper Waycaster with a "particularized and objective basis for suspecting legal wrongdoing." Williams, 808 F.3d at 246. Trooper Waycaster had a justified, reasonable suspicion that Defendant Bowman was engaged in criminal activity. As such, the Court finds that Trooper Waycaster did not violate the Fourth Amendment by extending the traffic stop in order to question Alvarez as to whether he and Defendant Bowman had been traveling to alleviate his suspicions of criminal activity.

Finally, the Court finds that Trooper Waycaster demonstrated a reasonable, articulable suspicion of the possibility of criminal conduct that would justify extending the traffic stop to further question Defendant Bowman and conduct the dog sniff. In addition to the previously discussed factors that led to Trooper Waycaster extending the stop to question Alvarez, Alvarez and Defendant Bowman gave conflicting stories about the location from which they were traveling. Alvarez stated that the two were returning from visiting friends in Georgia while Defendant Bowman maintained that he was picking up Alvarez from his girlfriend's house, which was twenty to thirty minutes aways. In short,

the Court finds that Trooper Waycaster had a particularized and objective basis for suspecting criminal activity and to further extend the stop to conduct the dog sniff. And once the trained drug dog alerted on the vehicle, Trooper Waycaster had probable cause to search the vehicle. See Palmer, 2016 WL 1594793, at *6. This search of the vehicle then led to the discovery of the illegal narcotics. Accordingly, the Court **RECOMMENDS** that the District Court **DENY** the Motion to Suppress [# 13].

## III. Conclusion

The Court **RECOMMENDS** that the District Court **DENY** the Motion to Suppress [# 13].

Signed: May 31, 2016

Dennis L. Howell
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), and Rule 72, Federal Rules of Civil Procedure, written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the district court will preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).